Cite as 2020 Ark. 138

# SUPREME COURT OF ARKANSAS

No. CR-19-156

| | | |
|---|---|---|
| | | Opinion Delivered: April 16, 2020 |
| CHARLES ALAN RICKMAN | | |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-17-1949] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE BRAD KARREN, JUDGE |
| | APPELLEE | |
| | | AFFIRMED. |

**JOHN DAN KEMP, Chief Justice**

A Benton County Circuit Court jury convicted appellant Charles Alan Rickman of two counts of rape and one count of kidnapping, aggravated residential burglary, and first-degree battery. He was sentenced to consecutive life terms for the rape, kidnapping, and burglary convictions and a consecutive term of twenty years' imprisonment and a $15,000 fine for the battery conviction. For reversal, he argues that the circuit court erred in denying his motion to suppress, denying his proffered jury instructions, and refusing to accept his guilty plea. We affirm.

## I. *Facts*

Rickman does not challenge the sufficiency of the evidence on appeal, so only a brief recitation of the facts is required. *Smith v. State*, 2018 Ark. 277, 555 S.W.3d 881. On

October 2, 2017, Susan Hazard, who lived alone in a remote area near Gravette, celebrated her sixty-ninth birthday and went to bed early that evening. At approximately 1:30 a.m. on October 3, she heard a knock on the door. She answered the door and saw Rickman, who had worked at her home as a contractor. Rickman said that his car had broken down and that he needed to use her phone. She cracked the door, handed him her cell phone, and listened to his conversation. When he returned the phone, he forced his way inside, grabbed her, wrapped a table runner around her head, and tied it around her neck. He stripped off her clothes, took her upstairs to the bedroom, tied her hands and feet with cords, and beat her. For a five-hour period, he raped her vaginally, anally, and orally with his penis and with foreign objects. At one point, he took her downstairs, placed her in the bathtub and rinsed her off because she "was full of blood," only to rape and beat her again. Before leaving, he untied her but left her blindfolded, threatened to kill her if anyone "drove into [her] driveway," and instructed her to tell anyone who might ask that she fell down the stairs. After he left, a coworker called, and Hazard informed her that she had been "brutally raped and beaten" and needed to go to the hospital.

Hazard was hospitalized for almost three months. Visible marks on her hands, feet, and neck indicated that she had been bound and strangled. She sustained extensive injuries to her vaginal and rectal areas and required multiple surgeries. At the hospital, she developed sepsis, which required the amputation of both arms and legs.

On October 3, 2017, Rickman was arrested on an unrelated outstanding warrant for driving on a suspended license and was taken into custody. That day, Detective

Susanne Matthews interviewed and Mirandized Rickman, and Rickman signed a waiver and statement of rights. During the interview, Detective Matthews asked about an article of bloodstained clothing—women's underwear—that the officers found in his car, and Rickman divulged that he liked to wear women's clothing while watching pornography. When the officer began inquiring specifically about a reported incident at Hazard's home, Rickman responded, "I think maybe you need to just get me a lawyer or something, because you're—you're gonna—I'm not answering any more of your questions." Detective Matthews terminated the interview, which lasted approximately five minutes.

On October 5, 2017, Benton County officers met with Rickman in one of the booking rooms. Captain Ed Motsinger advised him of his charges and informed him that if he changed his mind and wanted to speak to someone, then he would need to make a request with the jail staff. The officers did not question Rickman at that time. At 2:26 p.m. that day, Sergeant Desiree McCain, a booking officer, emailed Detective Matthews stating, "Charles Rickman is requesting to speak with you or Alyson [Detective Alison Nguyen]—I just couldn't figure out her e-mail." Detective Matthews then requested that Rickman be brought to the interview room to see what he wanted. There, Detective Matthews and Captain Motsinger again Mirandized Rickman and had him sign a second waiver and statement of rights. During this second interview, Rickman stated that he had been drinking and "got high on some meth" on the night of October 2, 2017. He confessed to the crimes and provided a number of details to the officers.

On July 6, 2018, the State filed an amended criminal information charging Rickman with aggravated residential burglary, kidnapping, two counts of rape, and first-degree battery. Rickman filed a motion to suppress his October 5 custodial statement. Following a hearing, the circuit court denied his motion to suppress. On July 10, the morning of trial, Rickman stated that he wished to plead guilty and to be sentenced by a jury. The prosecutor objected, and the circuit court rejected Rickman's offer to plead guilty. The case proceeded to trial, and the jury found Rickman guilty on all counts and sentenced him to consecutive life sentences on the rape, kidnapping, and burglary convictions and twenty years' imprisonment and a $15,000 fine on the first-degree battery conviction. Rickman timely filed his notice of appeal.

II. *Arguments*

A. Motion to Suppress

For his first point on appeal, Rickman argues that the circuit court erred in denying his motion to suppress his October 5 custodial statement. Specifically, Rickman contends that he did not initiate contact with law enforcement after he had requested to speak to counsel at the end of his October 3 interview, and as a result, his October 5 statement should not have been introduced into evidence.

We review a circuit court's decision denying a defendant's motion to suppress a confession by making an independent determination based on the totality of the circumstances, and the ruling will be reversed only if it is clearly against the preponderance of the evidence. *Airsman v. State*, 2014 Ark. 500, 451 S.W.3d 565. The Fifth Amendment

4

right to counsel attaches during custodial interrogation. *Id.*, 451 S.W.3d 565. When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *Id.*, 451 S.W.3d 565. Instead, an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Id.*, 451 S.W.3d 565. Although the accused may initiate further contact with the police, the impetus must come from the accused, not the police. *Id.*, 451 S.W.3d 565.

To illustrate, in *Stevenson v. State*, 2013 Ark. 100, 426 S.W.3d 416, Stevenson was taken to an interrogation room where he asserted his right to an attorney, and the interrogation was terminated. The police officer escorted him to a holding cell and stated that he could file a written request if he wished to speak with the officers again. Stevenson stated that he wished to speak with the officer. On appeal, he argued that the circuit court erred in denying his motion to suppress his statement because he had invoked the right to counsel. We stated,

> Stevenson invoked his right to counsel. When Addison told Stevenson that any further contact with law enforcement would only be upon written request, Stevenson said to Addison that "he would rather just go ahead and get this over with and talk to me now. He didn't want to have to go through that aspect of writin' a letter." While this statement is in response to the declaratory statement by Addison regarding how to contact the police, Addison's statement was not during interrogation and was not a statement that would reasonably elicit an incriminating

5

response. Stevenson expressed a desire to go ahead with the interview, and that he wished to speak with law-enforcement officers. The circuit court's denial of Stevenson's motion to suppress was not clearly against the preponderance of the evidence and we affirm its decision.

*Id.* at 7–8, 426 S.W.3d at 421.

In the present case, the record is clear that Rickman initiated further contact with the police before giving his second statement. Sergeant McCain testified at the suppression hearing that she "was sitting at one of the booking terminals, farther from the detox cell where [Rickman] was housed at, when he signaled his hand over to get my attention. . . . [H]e said that he would like to speak with somebody in CID [Criminal Investigation Division] about his case." Sergeant McCain stated that she emailed Detective Matthews that Rickman "requested to speak with somebody" about the case. Detective Matthews testified that Rickman was brought to an interview room, and she began the interview by reviewing the "Statement of Rights Form" and confirmed with Rickman that he understood his rights and agreed to speak with her. Thus, the evidence demonstrates that Rickman initiated further contact with the officers. That is to say, the impetus came from Rickman—not the Benton County police. Based on the totality of the circumstances, we conclude that Rickman initiated further contact with law enforcement, and we hold that the circuit court properly denied his motion to suppress.

B. Proffered Jury Instructions

6

For his second point on appeal, Rickman argues that the circuit court erred in rejecting his proffered jury instructions on Class B felony kidnapping and on concurrent or consecutive sentencing.

A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Hundley v. State*, 2020 Ark. 89. The circuit court's decision to give or reject an instruction will not be reversed unless the court abused its discretion. *Id.* When the circuit court determines that the jury should be instructed on an issue, the model criminal instructions must be used unless the court concludes they do not accurately state the law. *Grubbs v. State*, 2020 Ark. 42, 592 S.W.3d 688. If a proffered instruction is not a correct statement of the law, that is a valid and appropriate reason to refuse to give a particular jury instruction. *Id.*, 592 S.W.3d 688. Nor will it be error for the circuit court to refuse to give a proffered instruction if other instructions adequately covered the issue. *Id.*, 592 S.W.3d 688.

1. *Kidnapping instruction*

Kidnapping is a Class Y felony, but the charge can be lowered to a Class B felony if the defendant shows by a preponderance of the evidence that he voluntarily released the person restrained, alive and in a safe place prior to trial. Ark. Code Ann. § 5-11-102(b) (Repl. 2013). A victim has not been voluntarily released if the release was caused by the defendant's attempt to escape apprehension. *Woods v. State*, 302 Ark. 512, 790 S.W.2d 892 (1990). In determining what constitutes a safe place, the victim's familiarity with the place is one factor to be considered. *Ratliff v. State*, 359 Ark. 479, 199 S.W.3d 79 (2004).

7

However, a place is not safe merely because it is familiar to the victim. *Huff v. State*, 2012 Ark. 388, 423 S.W.3d 608 (holding that Huff's release of the victim in her front lawn and in the path of his vehicle was not a safe place); *Whitt v. State*, 281 Ark. 466, 664 S.W.2d 876 (1984) (holding that a victim left in the trunk of her car was not left in a safe place).

Further, in *Davis v. State*, 368 Ark. 401, 246 S.W.3d 862 (2007), the defendant attacked his stepdaughter and left her to be rescued in her home that she shared with her mother and the defendant. We stated,

> A case that bears much similarity to the case at hand, *Clark v. State*, 292 Ark. 69, 727 S.W.2d 853 (1984), is instructive here. The defendant in *Clark* kidnapped a family and later left the wife and children handcuffed to a pillar in their garage and the father handcuffed to a banister in his place of work. *Id.* Although the family was technically left in safe places—their home and work—we held that they were not "released," as contemplated by Ark. Code Ann. § 5-11-102(b), because they were left handcuffed to immovable structures, dependent upon being discovered by others.

> In the instant case, Davis left Leslie with a mask over her face, a gag in her mouth, her feet bound together, and her hands bound behind her back. She was left in a house that was in a rural area, and no one was expected home for several hours. While Leslie was lucky to find the cellular phone and scissors, she was unable to physically release herself from her restraints. In fact, by the time law-enforcement officers arrived, Leslie had begun losing the feeling in her limbs. Based upon this evidence, we cannot say that the circuit court erred in refusing to lower the charge from a Class Y to a Class B felony.

*Id.* at 408, 246 S.W.3d at 868.

While this court's holding in *Davis* is instructive, the victim in this case was not released in a safe place. Hazard testified at trial that after five hours of being raped and beaten in her own home, she did not ask for help or seek help because she thought that "if [she] didn't fully cooperate . . . he would kill me." She also testified that Rickman stated

8

emphatically that "if anyone drives into your driveway, I will kill you." After Rickman left, Hazard unwrapped the table runner that had been tied around her head and neck, received a call from her coworker, and said, "I have been brutally raped and beaten. I need to go to the hospital. . . . [B]ring one of the men that work there . . . because I didn't know if he is still around—if just two ladies—he may attack them. So I didn't want them to be in danger."

Here, Hazard was left—blindfolded, bleeding, and alone—in a debilitating physical condition in her home in a rural area. Her home was the scene of the crimes, and Rickman repeatedly threatened to kill her if she sought help after he left. Thus, we conclude that Rickman did not release Hazard in a safe place. Having considered this evidence, we hold that the circuit court did not abuse its discretion in declining to give the Class B kidnapping jury instruction under these circumstances, and we affirm.

## 2. *Sentencing instruction*

Next, Rickman contends—without much argument, case law, or analysis—that the circuit court abused its discretion by refusing to allow the jury to make a nonbinding recommendation on concurrent or consecutive sentences.

It is well established that the question of whether two separate sentences should run consecutively or concurrently lies solely within the province of the circuit court. *Brown v. State*, 316 Ark. 724, 875 S.W.2d 828 (1994); *Abdullah v. State*, 290 Ark. 537, 720 S.W.2d 902 (1986); *see also* Ark. Code Ann. § 5-4-403 (Repl. 2013); Ark. Code Ann. § 16-90-109

(Repl. 2016). Further, the appellant assumes a heavy burden of showing that the circuit court failed to give due consideration to the exercise of its discretion in the matter of consecutive sentences. *Edwards v. State*, 300 Ark. 4, 775 S.W.2d 900 (1989). Because the decision of whether to run sentences consecutively or concurrently lies within the province of the circuit court, Rickman has failed to establish that the circuit court abused its discretion. Accordingly, we affirm the circuit court's ruling.

### C. Guilty Plea

For his third point on appeal, Rickman argues that the circuit court erred in refusing to accept his guilty plea when the prosecutor objected. Specifically, Rickman contends that Rule 31.1 of the Arkansas Rules of Criminal Procedure should allow him to plead guilty over the prosecutor's objection and to be sentenced by a jury.

We have previously rejected this argument. This court has interpreted Rule 31.1 to provide that no defendant in any criminal cause may waive a jury trial unless the waiver is assented to by the prosecuting attorney and approved by the court. *State v. Smittie*, 341 Ark. 909, 20 S.W.3d 352 (2000); *State v. Singleton*, 340 Ark. 710, 13 S.W.3d 584 (2000); *State v. Vasquez-Aerreola*, 327 Ark. 617, 940 S.W.2d 451 (1997); *Fretwell v. State*, 289 Ark. 91, 708 S.W.2d 630 (1986).

Rickman offers no sound argument that we should depart from this precedent. Because the State did not assent to Rickman's guilty plea, we hold that the circuit court was without discretion to allow Rickman to plead guilty over the State's objection. Accordingly, we affirm on this point.

10

III. *Rule 4-3(i)*

Because Rickman received a life sentence, this court has complied with Arkansas Supreme Court Rule 4-3(i) (2019) and has examined the record for all objections, motions, and requests made by either party that were decided adversely to him. No prejudicial error has been found.

Affirmed.

HART, J., concurring in part; dissenting in part.

**JOSEPHINE LINKER HART, Justice, concurring in part and dissenting in part.** Rickman's crimes are obviously condemnable, and I join the majority opinion—except that Rickman, as required by law, should have received a jury instruction on the Class B Felony formulation for the Kidnapping charge. On that point, I dissent.

In Arkansas, Kidnapping is generally a Class Y Felony, but under certain circumstances, this charge is reduced to a Class B Felony. This reduction is applicable where the evidence shows that the defendant "released" the victim "alive" and in a "safe place." Ark. Code Ann. § 5-11-102(b).[1] Furthermore, one is entitled to a jury instruction for a given legal proposition if there is "any rational basis" for giving it, based upon the evidence presented at trial. *See, e.g., Grillot v. State*, 353 Ark. 294, 318, 107 S.W.3d 136,

---

[1]Ark. Code Ann. § 5-11-102(b) provides as follows:

(b)(1) Kidnapping is a Class Y felony.

(2) However, kidnapping is a Class B felony if the defendant shows by a preponderance of the evidence that he or she or an accomplice voluntarily released the person restrained alive and in a safe place prior to trial.

11

150 (2003) ("An instruction should only be excluded when there is *no rational basis* for giving it.") (emphases added).

In this case, the evidence at trial reflected that he left the victim alive and in her own home. Plainly, there is at least "some basis in the law" for the proposition that the defendant left the victim in a safe place, so the defendant should have received the instruction for Class B Felony Kidnapping and been allowed to argue that issue to the jury. Whether the victim's home in this case is a safe place is a question for the jury to decide. By refusing to give a jury instruction on Class B Felony Kidnapping, the circuit court impermissibly usurped the jury's role, thus committing reversible error.

The majority's reliance on *Davis v. State*, 368 Ark. 401, 246 S.W.3d 862 (2007) is clearly misplaced. The jury in *Davis* was instructed on both Class Y and Class B kidnapping. Davis was arguing that the reduction to Class B Kidnapping was so appropriate that the circuit judge should have dismissed the Class Y Kidnapping charge as a matter of law (before the case was given to the jury), not that an instruction was required to allow the jurors to decide the facts based upon the evidence presented. *Davis, supra.* Importantly, after the circuit judge denied the motion for directed verdict, Davis received the instruction on Class B Felony Kidnapping and was able to argue that issue to the jury.

On the other hand, Rickman is appealing from the refusal to allow a jury instruction after the close of all the evidence. Here, unlike *Davis*, there was zero chance that the jury in Rickman's case could conclude that the B Formulation of Kidnapping was appropriate because Rickman was not allowed to present that issue for their consideration.

12

In other words, Davis was afforded what Rickman was not: the opportunity to have his level of guilt determined by a jury. The majority's declaration that "the victim in this case was not released to a safe place" is simply fact-finding in plain disregard of our role as an appellate court.

The purpose of a jury trial is to seek the truth—by having twelve unbiased members of one's community consider the relevant evidence in light of the applicable law, and then determine what is proven and what is not. Jury instructions are central to this purpose. As I observed in *Douglas v. State*:

> Our system of justice relies upon the parties to present each side of the case through adversarial representation and the jury to decide what is actually proven at the trial. The parties' attorneys, tasked with presenting the best case for their respective clients, play a large and important role in this process. This system contemplates that the jury will receive and consider the evidence objectively, follow jury instructions (several, probably) from the trial court about any applicable legal authorities, listen to arguments (several, probably) from each party's counsel about how the legal propositions set forth in those instructions should or should not apply to the evidence presented, and then proceed to deliberations where it will separate the wheat from the chaff.
>
> In other words, there is (and must be) a lot of room between a trial judge's determination that there is "any rational basis" for giving a particular instruction in a particular case, and the jury's determination that the legal proposition set forth in that instruction was actually established at trial. A jury is free to reject the legal propositions contained in a thousand different jury instructions if it finds that the applicable burdens of proof for those legal propositions are not satisfied by the evidence presented at the trial, but a jury cannot agree with a legal proposition if that legal proposition is never set forth in an instruction for the jury's consideration. This is why we require a jury instruction where there is "any rational basis" for giving it.

2019 Ark. 57, at 15–16, 567 S.W.3d 483, 494 (Hart, J., dissenting). To refuse an appropriate jury instruction is to invade the province of the jury. It subverts the design and function of a jury trial, undercutting the jury's ability to do its job and the reliability of its conclusions. In this case, Rickman should have received a jury instruction on Class B Felony Kidnapping, and the circuit court's refusal to give that instruction was error. Because the majority refuses to acknowledge this error, thereby perpetuating an illegitimate legal proposition that will likely be weaponized in future cases, I dissent.

*Scholl Law Firm, P.L.L.C.*, by: *Scott A. Scholl*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.